**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **LUKE G. SAHS** | * | **CIVIL ACTION NO. 2:24-cv-01379** |
| | * | |
| **VERSUS** | * | **SECTION: E (3)** |
| | * | |
| **LOYOLA UNIVERSITY** | * | **JUDGE SUSIE MORGAN** |
| **NEW ORLEANS** | * | |
| | * | **MAG. JUDGE EVA J. DOSSIER** |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S SPECIAL**</u>
<u>**MOTION TO STRIKE**</u>

Now comes Plaintiff, Luke G. Sahs, by and through undersigned counsel, and hereby responds to Defendant Loyola University New Orleans', Special Motion to Strike Pursuant to Louisiana Code of Civil Procedure Article 971, herein "the Motion." (Doc. 43.)

**I.      INTRODUCTION**

This case arises from a series of defamatory and other intentional and tortious conduct by Defendant Loyola University New Orleans ("Loyola"), a powerful, private institution, against its own student. In the fall of 2022, Plaintiff commenced his higher education at Loyola and was excited about what the school had to offer. He contemplated, pursuant to the terms of his merit scholarship, that he would not only obtain an undergraduate degree from the institution, but also a master's degree. Approximately six months later, the school that had welcomed Luke with open arms destroyed his academic career, reputation, sense of community, and sense of safety in less than seventy-two hours through a series of institutional failures and their reckless disregard for the truth within their law enforcement arm, their captive media outlet, and their administration.

Defendant Loyola seeks to find refuge from liability for their tortious conduct by invoking the "extraordinary procedural remedy" provided by La. Code Civ.P. art. 971("Art. 971") – Louisiana's statutory framework for targeting "strategic lawsuits against public participation" a

1

phrase used to describe "generally meritless suits brought by large private interests to deter common citizens from exercising their constitutional right to petition or to punish them for doing so." *Yount v. Handshoe*, 171 So.3d 381, 387 (La.App. 5 Cir.2015); *Schmidt v. Cal-Dive Int'l, Inc.*, 183 F. Supp. 3d 784, 788 (W.D. La. 2016). "The objective of a SLAPP suit is not to win, 'but to silence or intimidate those defendants who are haled into court and forced to incur a sufficient enough expense such that he or she would cease the exercise of their constitutional rights of petition or speech.'" *Schmidt.*, 183 F. Supp. 3d at 789, fn. 3, quoting 123 AM. JUR. 3D Proof of Facts § 341 (2011).

This is not a meritless suit brought by a large private interest and in no way intended to "silence" or "intimidate" Loyola. This suit has been brought because a young man at the early stages of his academic career and life was irreparably damaged by employees and agents of an academic institution that acted with reckless disregard as to whether absurd unsupported allegations that he was a domestic terrorist and danger to the community at large were true. Free speech is undoubtedly of paramount importance and a critical right, but just as appealing to "sympathy" cannot save a meritless claim, the First Amendment cannot be used as a smokescreen to dismiss a meritorious case. This Court can and should deny Defendant's Motion and permit Plaintiff to pursue his claims.

## II.    FACTS

In February 2023, Luke Sahs, a freshman in his second semester at Defendant Loyola, accepted an invitation to participate in a weeklong, school-sponsored trip to Honduras to explore marine biology. (FAC at ¶19.) The trip was a perfect opportunity for Luke – a certified open water diver with a passion for marine biology. (Id. at ¶15.) Only three other students signed up for the trip; only one of those students was also certified for open water diving: Morgan Matteson. (*Id.* at ¶¶20-21.) While Luke and Ms. Matteson had never spoken to each other before the trip, they quickly became friends after being assigned dive partners. (*Id.* at ¶22.) The other students on the trip observed the fast friendship between Luke and Ms. Matteson, describing them as "inseparable"

throughout the week. (*Id.* at ¶23.) Ms. Matteson demonstrated to Luke that she was comfortable with him by sharing highly personal information about her mental health struggles and prior treatment programs. (*Id.* at ¶24) Near the end of the trip, Luke advised Ms. Matteson that he was only looking for friendship. (*Id.* at ¶¶25, 27.) Luke did not perceive this as a problem, and he believed he and Ms. Matteson would remain friends upon returning to Loyola. (*Id.*) Unfortunately, Luke was mistaken.

### Matteson's "Report" to the NOPD

Several days after returning from Honduras, on March 2, 2023 at approximately 3:30 p.m. Ms. Matteson presented to the New Orleans Police Department ("NOPD") and made a (false) complaint against Luke for misdemeanor "stalking." (*Id.* at ¶32.) At that time, Ms. Matteson (falsely) alleged to a NOPD officer that on February 22, 2023 Luke confessed that he had been "relentlessly stalking" her for months prior to the trip. (*Id.* at ¶29 & Ex. III.) Ms. Matteson claimed to be fearful for her life based upon statements made by Luke. (*Id.*)

Based upon Ms. Matteson's statements pertaining to alleged "stalking" behavior, a confidential, non-public Arrest Warrant with supporting Affidavit for Arrest Warrant was issued and signed by a Magistrate of Orleans Parish at **6:40 pm on March 2, 2023**. (Id. at ¶33; Declaration of Elizabeth Carpenter, Esq. ("E. Carp. Dec.") attached hereto as "Exhibit B," at ¶5.) The documents, collectively referred to as the "Arrest Warrant and Affidavit" ("Arrest Warrant"), were unambiguously marked "LAW ENFORCEMENT USE ONLY," as is standard prior to filing the same as part of a booking. (E. Carp. Dec. at ¶6.)[1] The legal charge on the Arrest Warrant and the only basis for the charges made was for the "stalking" alleged by Ms. Matteson. (*Id.* at ¶35; E.Carp. Dec. at ," ¶7; & Affidavit for Arrest Warrant and Arrest Warrant, Ex. 1 thereto.)

---

[1] While not initially attached to the FAC, the Arrest Warrant bearing "law enforcement use only" has been supplemented through the E. Carp. Dec. Significantly, the stamp LAW ENFORCEMENT USE ONLY on a document (e.g., Arrest Warrant and Incident Report or Narrative Report) legally restricts the use of such document to, obviously, law enforcement. *See Neylon v. Cnty. of Inyo*, 2016 WL 6834097 (E.D. Cal. 2016) n. 4 ("The stamps ["For Law Enforcement Purposes Only" and "For Law Enforcement Use Only"] . . . show that it is not a publicly available record, rather it is a record that is restricted to law enforcement only . . . [and] is not the proper subject of judicial notice. Loyola had no legal rights to use the Arrest Warrant and Narrative Report for causing the defamatory statements and publications at issue.

While meeting with the NOPD officer on March 2, 2023, Ms. Matteson did make a number of other (false) allegations about or against Luke, information contained within the criminal complaint. However, these allegations were not the basis for the "stalking" charges, none of these allegations were included in the Arrest Warrant, and these (false) allegations **never resulted in any criminal charges filed, warrants issued, or other law enforcement proceedings**. Indeed, there is no evidence that the NOPD *ever* contemplated filing charges based upon information alleged in these "other" false statements, particularly in light of commentary made during Luke's misdemeanor stalking arrest, as discussed below. Ultimately, it is reasonable to assume that the NOPD did not take these claims seriously, possibly because they were accompanied by a (false) statement from Ms. Matteson that Luke had confessed to being a "diagnosed pathological liar" or because they were so outrageous that the credibility of the same was facially suspect. These "other" allegations by Ms. Matteson included claims that Luke boasted about being the descendent of Nazi war criminals who fled to Argentina to avoid prosecution at the Nuremberg Trials, that Luke had chemicals and bomb-making equipment in his possession and in his dormitory room, that Luke had "chemical burns" on his body, and that Luke openly expressed Nazi ideologies in front of other students on the Honduras trip. Indeed, all of these statements were patently untrue. (FAC at ¶¶30, 91-95; Sahs Dec. at ¶5-11.) Again, the Arrest Warrant did not include any allegations regarding alleged possession of chemical weapons, terroristic threats, or any postings by Plaintiff to social media, let alone postings regarding his accuser. (*See* FAC at ¶35; E. Carp. Dec. Ex. 1 thereto.)

### Sahs' Public Arrest for Frivolous "Stalking" Charge

On March 2, 2023 at approximately 7:20 p.m., several NOPD police officers met with officers of the Loyola University Police Department ("LUPD") (collectively, "the Officers") at the Campus Police Station. (Doc. 45-1, Ex. 1-A.) The NOPD officers had the Arrest Warrant and Affidavit, which indicated Luke was to be arrested for allegations related to misdemeanor stalking

– charges that were ultimately dropped for lack of evidence. (E. Carp. Dec. at ¶15.) Per Sgt. Bell, of the LUPD and an indisputable agent of Defendant, the NOPD officers provided a "short briefing" for the LUPD Officers. This would have been the first time that any LUPD Officers had the warrant and, per the record, the only time any LUPD Officers would have had occasion to hear any of the "other" allegations made by Ms. Matteson. Sgt. Bell indicates that a statement was made to him that Ms. Matteson said that Luke said he had the ability to mix dangerous chemicals that could be used to harm other people on Loyola's campus. (Doc. 43-3 at ¶ 9.) Sgt. Bell provides no attestation indicating that NOPD was pursuing other criminal charges against Luke.

At approximately 7:35 p.m. Loyola's police employee Sgt. Bell lead a group of NOPD officers to Luke's dormitory room to arrest him for allegations of <u>misdemeanor stalking</u>. (FAC at ¶42; E.Carp. Dec, ¶ 18-20.) Defendant's agent, Sgt. Bell knocked on Luke's dormitory room door and spoke to Luke's roommate; then three NOPD Officers entered the dorm room while Sgt. Bell stood guard nearby, as reflected in body camera footage. (E.Carp. Dec. at ¶¶18-21 & Ex. 4, Ex. 5 thereto; Doc. 43-3, Ex. 1.) The Officers were advised that Luke was not present, but, rather, at Loyola's Orleans Dining Room (the "Dining Hall"). (FAC at ¶42) Before departing, three NOPD Officers searched the small dorm room with Plaintiff's roommate present and while Sgt. Bell was in close proximity standing guard.  (*Id.* at ¶¶43-44, 95(k)-(m); E.Carp. Dec. at ¶ 22, Ex. 6 thereto.)[2] Nothing was taken into evidence when the room was searched. (FAC at ¶95(m); E. Carp. Dec. at ¶ 18 & Ex. 4, thereto.) The search certainly did not yield any chemical weapons or other dangerous materials. This conforms to statements made by Luke's roommate, who – in a subsequent interview with a private investigator retained by Plaintiff – confirmed that there had never been materials that could be used to create weapons in their dorm room and, due to the size of the room, he certainly would have known if there were. (FAC at ¶95.) Moreover, there were never any chemical weapons

---

[2] *Compare with* Doc. 41-5 (D. Bell Affidavit attached as Def. Ex. 1 to Motion), ¶10.

or dangerous materials within that room. (See Sahs Dec. at ¶ 8.)

After the search, the Officers, led by Sgt. Bell, proceeded to the Dining Hall where they located Luke, who was starting to eat dinner. Luke was identified, handcuffed, searched, and arrested in front of his peers. (*Id.* at ¶46; E. Carp. Dec. at ¶ 18, Exhibit 4 thereto.) In the background of another frame (Exhibit 8 to E.Carp. Dec. at ¶25) Sgt. Bell is seen observing an NOPD officer leading Luke out of the Dining Hall. When Luke was arrested, Sgt. Bell knew that Luke Sahs did not possess any chemicals that could be used to kill people.

While NOPD Officer Coleman was transporting the frightened college student to the police station, at approximately **7:56 p.m.**, Coleman can be heard telling Luke "**I have a warrant for you for stalking, not for bombs. If I thought that you committed [sic] a bomb, it would not be NOPD picking you up**, it would be someone else." (E. Carp. Dec. at ¶26 & Ex. 4 thereto.) Coleman's statement, logically, gives rise to the inference that the information furnished through that point did not lead Coleman or the NOPD to "think" or believe that any allegations related to making "bombs" was genuine.[3]

NOPD Officer Coleman subsequently prepared an Incident Report, which is timestamped **March 2, 2023 at 8:22 p.m.** (E. Carp. Dec. at ¶¶ 9-13 & Ex. 2 thereto.) While the Incident Report – also referred to as the Initial Report or Initial Arrest Report – "noted" other outlandish statements made by Ms. Matteson to the NOPD, these did not form the basis for the arrest, nor were they included whatsoever in the Arrest Affidavit. (*Id.*) The Incident Report did not indicate that Ms. Matteson produced any evidence of these claims. The Incident Report does not include any statements suggesting further charges were being considered or were to be investigated.

The Incident Report, upon creation, was conspicuously marked "LAW ENFORCEMENT

---

[3] This statement seemingly contradicts the statement made by Sgt. Bell in his affidavit provided by Defendant in support of their Motion. Sgt. Bell claims that the NOPD officers expressed specific concern about an allegation by Ms. Matteson that Luke knew how to make, in essence, chemical weapons. (Doc. 43-3, ¶¶9-11, Ex. 1.)

USE ONLY."[4] Even though the booking process began at approximately 8:50 p.m., this report only became a public record when booking was completed by filing said documents, along with the Arrest Warrant and Affidavit, with the court on **March 3, 2023 at 1:09 a.m.** (FAC at ¶¶56-57.) However, before the booking process was complete and (seemingly) before a single incident report was generated regarding Matteson's allegations, Defendant – by and through multiple different agents – began a course of conduct that completely dismantled Luke's life through recklessly disseminating sensationalized false claims indicating that Luke was not only being arrested for misdemeanor stalking, but was, in essence, a domestic terrorist definitively in possession of chemical weapons and targeting Ms. Matteson based upon her "nationality."

**Defendant Begins to Spread False Statements through Sargent Bell**

The reckless spread of this disinformation was initiated through communications between Defendant's law enforcement arm (the LUPD) and Defendant's media arm (the University news outlet, *The Maroon*). Apparently, shortly after the arrest of Luke, a LUPD agent told an editor of *The Maroon* to send a reporter to the station for more information about the arrest on the evening of March 2, 2023.[5] Defendant, as *The Maroon*, sent its agent Kloe Witt, who was recently instated as the publications Breaking News Editor. (Doc. 43-5, Ex. 2.) Kloe presented to the station, identified herself as a reporter and was granted entry. Kloe conversed with Sgt. Bell and (allegedly) recorded the entirety of their conversation. (Doc. 43-3, Ex. 1; Doc. 43-5. Ex. 2.)[6]

An agent of Defendant, Marquita Morgan-Jones, was present, heard Sgt. Bell's statements, and observed Kloe record the conversation. Indeed, subsequent reporting by *The Maroon* details that Ms. Jones was present throughout the briefing with Sgt. Bell and "confiscated" a copy of the then-

---

[4] This restricted its use to only NOPD. Loyola including Prof. Giusti had no legal right to use the Incident Report (nor the Arrest Warrant) for any purpose. See fn. 2, supra, citing relevant case law.

[5] Batson, Macie, "Loyola punishes Maroon reporter for ethically and legally reporting story." *The Maroon* (April 5, 2023) available at https://loyolamaroon.com/10038452/news/campus/loyola-punishes-maroon-reporter-for-ethically-and-legally-reported-story/ (accessed Nov. 20, 2024.)

confidential Arrest Warrant that Sgt. Bell is heard giving to Kloe in the recording. Additionally, while the Recording, produced by Defendant as Exhibit 2A to Defendant's Motion and discussed briefly in the supporting affidavits of Sgt. Bell and Kloe Witt, is purportedly a complete recording of the conversation with Bell, the recording abruptly starts with Sgt. Bell speaking to Kloe Witt about "background" concerning the arrest with no introduction.

What is easily discernable through the audio recording is that on the evening of March 2, 2023, Sgt. Bell falsely reported to Kloe Witt that Luke had not only been "stalking" Matteson, but that Luke had also "started to go on social media and talk about things like where his parents are from, his nationality…*he has chemical material in possession that he can mix, that he can kill people with* and different things like that." (See Doc. 43-6, Ex. 2A; see also Williams Dec. attached hereto as "Exhibit C" and Exhibit C-1.) In context, it is clear that these statements were not made as "allegations," but, rather, as definitive facts based upon "background" information in an officer's possession. Yet these statements were, in actuality, false. (See generally Sahs Dec. ¶¶5-10.)

At most, Sgt. Bell attests that during a conversation with an NOPD officer – during what would have been a 15-minute window between 7:20 and 7:35 p.m. – Bell was told that Ms. Matteson had alleged Luke "made threatening statements that he had the ability to mix dangerous chemicals that could be used to harm other people on Loyola's campus." (Doc. 43-3, ¶ 9.) In other words, Defendant offers – at best – that Sgt. Bell can confirm (1) NOPD said that (2) Ms. Matteson said that (3) Luke said that he had the ability to cause bodily harm through mixing dangerous chemicals. This is a far cry from a definitive allegation that a student, in fact, has chemical material *in his possession* that he can mix and kill people with. The recording also indicates, and Sgt. Bell acknowledges, that he told Kloe that based upon the "background" information he provided, Sgt. Bell believed "he's [Luke's] gonna be brought up on some terroristic uh threats also." During this conversation, Sgt. Bell notably denies that a search of Luke's (dormitory) room occurred, though it

did occur while Bell was standing in close proximity to the room itself. (*Id.*; E.Carp. Dec. ¶18, Ex. 4.) The fact that nothing was seized from the room would certainly be of interest in the context of an allegation about a college student being in *possession of tools to make chemical weapons*.

In addition to the foregoing, it can be reasonably inferred that Defendant, by and through Sgt. Bell, knew or had constructive knowledge that everything told to Kloe would be published: *The Maroon* was told by LUPD to send a reporter to gather information of the arrest, Kloe presented to LUPD and identified as a reporter for *The Maroon*, Kloe was conspicuously recording the interview, and Kloe was handed a copy of the then-confidential Arrest Warrant and Affidavit.

### Defendant, by and through *The Maroon*, Prepares the "First Defamatory Article"

At some unknown time after Kloe recorded her conversation with Sgt. Bell and apparently left the station, she began preparing an article about Luke's arrest, which was headlined "Loyola student arrested in dining hall" and published the same evening, March 2, 2023. This original article is herein referred to as "the First Defamatory Article." The article repeated the false and inherently damaging statements made by Sgt. Bell and included new false statements that do not reflect what "LUPD said." Further, while the article purports to be about the "arrest" – an arrest for "stalking" – the majority of substantive allegations against Luke concern the unsupported "other" claims that did not relate to the "stalking" charge. More specifically, the article highlights the existence of "chemical materials," "terroristic threat[s]" and the dissemination of personal information about Matteson, her family and her "nationality." (See Doc. 37-1, Ex. IX (First Defamatory Article).

As stated there was no – and is no – evidence that Luke was ever "in possession" of materials capable of creating chemical weapons, as discussed above. Further, the article repeats the statement by Sgt. Bell that he, a law enforcement officer, believed Luke would "be brought up on terroristic threat charges as well." This statement reasonably, and in context, suggests the existence of further undisclosed facts supporting a charge relating to "terroristic threats" – a charge that under Louisiana

law can result in a fifteen-year prison sentence. (See See La. R.S. § 14:40.1 ("Terrorizing; menacing."))

Finally, Witt inexplicably claims that "LUPD said Sahs made social media posts *about the student who completed the report*, *spreading personal information about them such as the individual's nationality and family*." However, this is not what is stated by Sgt. Bell in the recording, nor is such an allegation made anywhere but in Witt's article. There is no evidence that Ms. Matteson ever accused Luke of engaging in this conduct. It is a fabrication generated by Loyola alone that advances the false narrative that not only was Luke a "terrorist," but singling out individuals based upon their "nationality." It is a patent falsehood and one that is absurdly outlandish given that Luke did not even have any social media accounts at the time. (Sahs Dec. at ¶¶9-10.)

Defendant attempts to justify the propriety of publishing the article, riddled with falsehoods through the affidavit of Professor Giusti, *The Maroon's* faculty advisor. Professor Giusti claims that he actually reviewed and approved a draft of Witt's article and did not find anything "improper" about publishing the article "on the night of March 2, 2023" because it "accurately reported information received directly from LUPD." (Doc. 43-8, Ex. 3 at ¶¶5-6.)[7] Giusti, notably, does not identify the source of the "information" to which he refers, nor indicate whether he personally reviewed the source(s) of the information - a seemingly foundational requirement to allow him to attest to the "fact" that the article was "accurately reporting" on information from LUPD. Indeed, it is apparent Giusti must not have personally reviewed the source "information" and compared it to what Ms. Witt wrote. If he had, he would have known that the allegation that Luke published

---

[7] Plaintiff notes that Giusti's statement is in conflict with the Code of Ethics for *The Maroon* – which, though no longer publicly accessible through the link on the publication's website, was archived as recently as April 13, 2024. See Ex. C hereto, Williams Dec.¶7 & Ex. C-2. That Code, in the section pertaining to "Fair Play" states, that "[t]he news media should not communicate unofficial charges affecting one's reputation or concerning one's moral character without giving the accused a chance to reply." When The Maroon published the story Luke was not, in fact, charged and the assertion that further charges of terroristic threats were believed to be forthcoming without giving the jailed freshman student an opportunity to respond seem quite "improper." Likewise, the Code includes a section entitled "Accuracy and Objectivity" and the principle that "There is no excuse for inaccuracies or lack of thoroughness." Not actually reviewing the content at issue would appear to be "inexcusable" as would, for example, post-hoc fact checking – like contacting Luke's roommate after the story was published to retroactively confirm its accuracy. (FAC. at ¶ 95(p)-(r)).

personal information about Ms. Matteson to social media, such as her "nationality" and information about her family, is a complete fabrication.

Ultimately, on March 2, 2023, within hours of Luke's arrest, before he had even been formally charged, and while he was, unquestionably, in no position to provide any form of "response" to the false allegations against him, Loyola's agents at *The Maroon* published an article creating the indelible impression that Luke was a danger to the community and a domestic terrorist based upon Loyola's own statements that were made with complete and utter reckless disregard as to the truth or falsity of the same. This article was circulated broadly and had an immediate and damaging impact.

### Defendant Suspends Luke Based Upon a Fabricated Statement about "Weapons"

Luke continued to be injured by Defendant when, on March 3, 2023, Luke was summarily suspended based upon violating the Student Code of Conduct pertaining to "weapons." In the Notice of Suspension issued "to" the jailed student – upon which his parents were copied – it was alleged that "this charge stems from information the University allegedly received from a faculty member while on a study abroad trip to Roatan, Honduras. The faculty member reported that Luke made concerning statements stating that he wanted to 'kill everyone in Buddig Hall' and 'could easily make a chemical gas, put it in the air and kill everyone in their sleep.' Luke continued by stating that he could do this in every residence hall, not just Buddig." (Doc. 37; FAC at ¶¶89-90, Ex. VII.)

As alleged in Plaintiff's First Amended Complaint, these allegations were fundamentally false and baseless. This haphazard suspension letter falsely indicated that Luke was arrested for allegations regarding "weapons" even though Defendant was already in possession of the Arrest Warrant and Affidavit reflecting that the only charge brought was for "stalking" – a serious allegation, but fundamentally different from a weapons violation. The source of the false statements contained within the Suspension Letter remains a mystery. Indeed, Plaintiff, through his attorney,

conducted a thorough investigation, since Defendant could not locate any "faculty member" present on the trip who *could have* made the statements at issue. (FAC at ¶ 93. Sahs Dec. at ¶19.)

**Defendant's Feeble Attempt to "Fix" the First Defamatory Article**

On March 10, 2023, Luke sought for *The Maroon* to remedy the inaccuracies in the First Defamatory Article, which were causing him extraordinary suffering. Defendant without apology or acknowledging its reckless disregard for the truth or Luke's rights did "modify" the First Defamatory Article. Yet, Defendant still did not fully remedy its erroneous and defamatory reporting, nor acknowledge the article had been edited to correct misconceptions regarding the false statements originally made. Indeed, Professor Giusti, who authored an edited "version" of the article republished on or about March 16, 2023 curiously maintains in his affidavit to this Court that the initial article should never have been removed at all because it "accurately relayed information received directly from the LUPD." However, as illustrated above, the First Defamatory Article clearly contained fabricated allegations by Ms. Matteson against Luke that she never made.

When republished, the article maintained March 2, 2023 as the publication date and "Kloe Witt" as the author. [8] Despite the revisions, the article still states: "According to an Orleans Parish Sheriff's Office **arrest affidavit**, a student filed a report accusing Sahs of stalking. **The affidavit claimed Sahs was in possession of chemical materials that can be used to kill people**. The report said Sahs had told the person who filled out the stalking complaint [Matteson] that he had followed her without her knowledge for several months and gathered information on her day to day movements and activities." As stated in Plaintiff's Complaint and now acknowledged by Defendant through its agent, Professor Giusti, it is simply not true that "the [arrest] affidavit" – a sworn

---

[8] The latter aspect is of significant interest considering that on March 13, 2023, three days after Defendant received the letter from Plaintiff's counsel seeking removal of the First Defamatory Article, Ms. Witt was issued a notice of an alleged violation of the Student Code of Conduct in connection with recording Sgt. Bell on the evening of March 2, 2023. Ms. Witt was subsequently found responsible of misconduct for recording Sgt. Bell on March 20, 2023. These actions against Ms. Witt and her subsequent appeal of the conduct violations, notably, brought further significant attention to the false claims against Luke, as non-profit free speech organizations became involved in the matter, published articles, and included links and citations to the articles containing false claims about Plaintiff.

statement that, on its face, indicates the factual allegations therein serve as the basis for the charges alleged – "claimed Sahs was in possession of chemical weapons." (See E.Carp. Dec., Ex. 1; Doc 43-8, Ex. 3 at ¶ 12.) While Giusti now, finally, has admitted to a mistake, he claims the only mistake is in the labeling of the document he reviewed. However, there is a clear, fundamental and material difference between a sworn affidavit of an officer and contents of a criminal complaint or narrative statement that can include any information an accuser chose to submit. Further, and more importantly, regardless of the name of the document, there does not exist a single document which indicates that Plaintiff **was in possession** of chemical weapons. The Second Defamatory Article remains publicly available to this day.

### **Impact on Luke Sahs**

Ultimately, on January 22, 2024, the date the misdemeanor stalking case was set for trial, the charges were dismissed by the New Orleans District Attorney for lack of evidence. (*Id.*, ¶118; E.Carp. Dec. at ¶15.)  Luke was definitively never charged relative to the possession of weapons or "chemical materials" that could be used for harmful purposes, as there was simply no evidence to substantiate those false allegations.  (*Id.* at ¶119.) While Luke was legally cleared, the irreparable damage had already been done and continues to this day. (Sahs Dec. at ¶¶18-22.)

On January 22, 2024, the charges were dismissed for lack of evidence. (*Id.*, ¶118; E.Carp. Dec. at ¶15.)  While Luke's name was cleared, the irreparable damage had already been done and continues to this day. (Sahs Dec. at ¶¶18-22.) As the result of Defendant's conduct Luke has suffered significant reputational harm, lost friends and a sense of community, experienced humiliation, fear, anxiety, isolation, and worries to this day about the impact of the same in the future. Plaintiff's academic career was disrupted and was economically damaged through, amongst other things, the loss of tuition and a merit scholarship he planned to have for at least three more years.

## II.    APPLICABLE LAW

### A.    Threshold Jurisdictional Issue: Florida Law, Not Louisiana Law, Applies

Florida law governs Sahs' claim for punitive damages pursuant to La. C.C. art. 3546 which states *inter alia* that punitive damages may be recovered in Louisiana "by the law of the state where the injurious conduct occurred <u>and</u> by . . . the law of the state where the resulting injury occurred." The injurious conduct occurred in Florida by Loyola's publication in Florida of the two libel articles on the Maroon, and the resulting injury to Sahs reputation occurred in Florida. (R.Berg Decl. Doc. 15-1 ¶¶ 5-6 and Doc. 15-3; G.Schein Decl. Doc. 15-32; and  C.Knight Decl. Doc. 15-31.)[9]

On May 29, 2024, Judge Paul C. Huck transferred this lawsuit from the Southern District of Florida to the Eastern District of Louisiana, based on lack of jurisdiction over Defendant Loyola, and distinct and separate from any lack of jurisdiction, based on finding of  *forum non conveniens* under 28 U.S.C. § 1404 as discussed in *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1338 (11th Cir. 2020) (discussing the *forum non conveniens* factors).[10]

In *Van Dusen v. Barrack,* the Court held that in diversity actions, changes of venue within the federal system do not change the *state* law which is applied to the cases. The Court wrote that "[a] change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S. Ct. 805, 821 (1964). As such, Florida law should apply, and any application under L.C.C.P. Article 971 should be viewed as moot.

### B.    Motion to Strike Standard Under L.C.C.P. Article 971

---

[9] These documents were submitted while the case remained before the Southern District of Florida and bore Case No. 1:24-cv-20747-PCH.

[10]   The Transferring Court's Order partly stated: "[T]he Southern District of Florida would be the improper venue for this case. The principles of *forum non conveniens* weigh heavily in favor of transferring this case to the Eastern District of Louisiana, trumping the deference generally given to a plaintiff's choice of forum. See *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1338 (11th Cir. 2020) (discussing the *forum non conveniens* factors). The Eastern District of Louisiana is an adequate and available alternative forum and both the private and public factors weigh in favor of transfer; the vast majority of witnesses and documentary evidence are in the Eastern District of Louisiana and Louisiana has a greater interest than Florida in deciding this dispute, given the questions of Louisiana state law at issue and the involvement of many Louisiana residents in the case." Doc. 17.j

Under Art. 971 "a cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution *in connection with a public issue* shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim." Art. 971(A)(1). Thus, the defendant must make a prima facie showing that Art. 971 covers the speech or activity at issue was in furtherance of the…right of petition or free speech under the United States or Louisiana Constitution *in connection with a public issue*." (internal citations omitted*) Schmidt*, 183 F. Supp. 3d 784 at 790.

"If the mover makes a prima facie showing his comments were constitutionally protected and in connection with a public issue, the burden shifts to the plaintiff to demonstrate a probability of success on the claim." *Yount,* 171 So. 3d 381 at 386.  "In those cases where more than one claim is alleged in the petition, courts examine the probability of success of each claim individually." *Yount,* 171 So. 3d 381 at 386 citing *Darden v. Smith*, 03–1144 (La.App. 3 Cir. 06/30/04), 879 So.2d 390, 397. "If the plaintiff can demonstrate a probability of success on any claim, then the motion must fail." *Yount,* 171 So. 3d 381 at 386.

The Fifth Circuit has determined the "'probability of success' standard does not permit courts to weigh evidence, assess credibility, or resolve disputed issues of material fact." *Block v. Tanenhaus*, 815 F.3d 218, 221 (5th Cir.2016). "In other words, a non-movant's burden in opposing an Article 971 motion to strike is the same as that of a non-movant opposing summary judgment under Rule 56." *Id*. Therefore, to defeat an Art. 971 dismissal on a motion to strike, a plaintiff need only establish a genuine dispute of material fact, just as for opposing a motion for summary judgment under Federal Rule of Civil Procedure 56. *See Block*, 815 F.3d 218 at 221.

## III.    LEGAL ARGUMENT: DEFENDANT IS NOT ENTITLED TO DISMISSAL UNDER ART. 971.

### A.  Defendant Did Not Meet its Burden of Demonstrating All Conduct at Issue Falls within

the Protections of Art. 971(F)

Defendant initially argues that Plaintiff's claims fall within the protections of Art. 971, as the speech or activities at issue were allegedly undertaken "in furtherance of the…right of petition or free speech under the United States or Louisiana Constitution *in connection with a public issue.*" Defendant, specifically, asserts that the conduct at issue was speech in connection with a public issue and reporting on alleged criminal activity.

Louisiana Courts have interpreted the "public issue" and "public interest" requirement as being the same as "public concern" in defamation cases. *Z Bayou, L.L.C., et al v. WAFB, L.L.C., et al* No. 15-4384, 2016 WL 5940867, at 2 (E. D. La. Oct. 13, 2016) citing *Lyons v. Knight*, 2010-1470 (La. App. 3 Cir. 5/11/11), 65 So. 3d 257, 265. "Whether speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the entire record." *Collins v. WAFB, LLC*, No. CV 16-15648, 45 Media L. Rep. 1893, 2017 WL 1383948 (E.D.La. Apr. 18, 2017); *Connick v. Myers*, 461 U.S. 138, 146-148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). As such, this is a highly fact specific inquiry.

Additionally, courts interpreting Art. 971 have found that speech or activity must be in connection with a public issue even if it falls within the ambit of subsections (a) and (b) of Art. 971(F) – i.e. speech constituting a statement, written or oral, in a judicial (or other official) proceeding or in connection with an issue under consideration by a judicial (or other official) body. See *Yount*, 171 So.3d 381 at 386-87 (reasoning that under Art. 971(F)(1)(a) speech must be in connection with a public issue, not merely made about a matter concerning an official proceeding); *Schmidt*, 183 F. Supp. 3d 784 at 791 (following *Yount* and interpreting Art. 971(F)(1)(a) and (b) as requiring that the speech has to be regarding a public issue and found the defendant failed to meet its burden under the first prong of Art. 971 by demonstrating that the speech concerned a public issue).

Instructive is *Yount*, 171 So.3d 381 at 386-87, which declined to interpret Art. 971(F)(1)(b)

as allowing any and all statements made in connection with any issue under consideration by an official body, which would include judicial bodies, protected under the statute. Instead, the *Yount* Court interpreted Art. 971(F)(1)(b), as only applying to statements under consideration by an official body <u>and</u> made *in connection with public issues*. In discussing this requirement, the *Yount* court identified the types of cases that did not invoke "public issues:" "comments made by members of private hunting club to fellow members, (*Savoie v. Page*, 09–0415 (La.App. 3 Cir. 11/04/09), 23 So.3d 1013); allegations made in criminal complaint of forgery by clients against interior designer, (*Lyons v. Knight*, 10–1470 (La.App. 3 Cir. 05/11/11), 65 So.3d 257)" *Id.* at 389. The *Yount* court observed a common thread amongst these cases that ultimately involved private disputes – including disputes that involved legal proceedings, including criminal proceedings – between private parties. For example, in *Lyons*, a business dispute resulted in the defendant making false statements in a criminal complaint resulting in criminal proceedings against the plaintiff, which were ultimately terminated in the plaintiff's favor and served as the basis for a malicious prosecution claim. The plaintiff's defamation and malicious prosecution claims were dismissed by the trial court and the decision was reversed by the court of appeals, which found that the case was not about a "public concern," but rather a private dispute between private individuals.

The court in *Yount* ultimately concluded that while the publications at issue did concern matters in connection with a judicial proceeding, they were nevertheless unprotected, as the statements were not made in connection with a matter of public concern. The court noted that the defamatory content was not "news" or of public concern simply because defendant claimed his website published "news;" this, the court explained, was a logical fallacy. Further, the court noted that "the drawing was under seal, [and] it was not publicly available information." *Id.* at 389. The court emphasized that while there might be a public right of access to documents, this did not necessarily render commentary about the same protected speech, per se.

17

Here, Defendant's argument concerning the "public issue" or "public concern" requirements of Art. 971 rests upon the notion that reporting upon allegations of criminal conduct is, in essence, a matter of public concern *per se*. (Doc. 43.) Defendant states: "In the instant case, Sgt. Bell's oral statements to Witt, and the two Maroon articles at issue, which the speakers reasonably believed to be true, constitute free and protected speech on a matter of public concern—the criminal investigation, suspected criminal activity, and arrest of Luke Sahs." In support of the same, Defendant cites a variety of cases involving publications about alleged crimes and a brief discussion of *Collins v. WAFB, LLC*, 2017 WL 1383948, *4 (E.D. La Apr. 18, 2017).[11] In briefly discussing *Collins*, Defendant specifically states that the case involved "a news broadcast, which relied on a Sheriff's Office press release that a private businesswoman had been arrested for issuing worthless checks, concerned a matter of public interest that satisfied Article 971's requirement. The Court stated that alleged '[c]riminal activity is certainly a matter of concern to the community and the subject of legitimate news interest.'" (Doc. 43-1 at pg. 15).

However, *Collins* does not create a bright line rule that any speech related to – or "media" reporting on – any alleged "criminal investigation," conduct, or arrest necessarily renders such speech a matter of public concern or obviates the need to assess whether public concern is implicated by speech or conduct on a case by case basis, as the *Collins* court itself instructs. Moreover, Defendant's discussion of *Collins* omits context, as well as distinguishing facts, that necessarily informed the court's decision. The court held that "[e]ssentially, Defendant WAFB relied on a press release from the [local] Sheriff's Office to report that *a local businesswoman issued worthless checks in the amount of $27,000 to purchase fuel from local distributors and then resell that fuel to other businesses*." (Emphasis added.) *Id*. at *4. The court then remarked: "[i]ssuing worthless checks is a crime. Criminal activity is certainly a matter of concern to the community and the subject of

---

[11] None of these cases post-date the *Shelvon* decision, which necessarily implicates the fact that judicial proceedings (which would include criminal proceedings) must nevertheless be matters of *public interest* to satisfy the standard.

legitimate news interest." *Id.* at * 4.

Other cases cited by Defendant as specifically analyzing reporting on "crimes" under Art. 971 are factually distinguishable from this reporting on (partially) non-public allegations of misdemeanor stalking and other conduct that *never gave rise to any charges* or, per the record, yielded any further investigation. In *Lee v. Pennington*, 2002-0381 (La. App. 4 Cir. 10/16/02), 830 So. 2d 1037, 1040, writ denied, 2002-2790 (La. 1/24/03), 836 So. 2d 52, the plaintiff was arrested on – and ultimately convicted of – two counts of aggravated rape and one count of forcible rape. The applicability of Art. 971 was not, directly, addressed through the appeal, but the court implicitly found that reporting someone was arrested on three counts of aggravated or forcible rape was a matter of public concern and/or interest.

*Patton v. O'Bannon*, 2011-0989 (La. App. 1 Cir. 12/21/11), as amended on reh'g (Jan. 4, 2012), writ denied, 2012-0223 (La. 3/30/12), 85 So. 3d 120, is essentially identical to and fully reliant upon *Lee*. The media defendants either republished the press release verbatim or through minor paraphrasing and summarizing, but without any substantive changes. The court, relying on *Lee*, found "the plaintiff's convictions are a subject of public concern and public record, and the defendants had a constitutional right to inform the public." *Id.* at *3.

When examining the "content, form, and context" of the speech, as required, Plaintiff submits Defendant – by and through all of its "publishers" – was not reporting on matters of legitimate news interest or matters that were generally of "public importance" or "public concern." First, Sgt. Bell had no basis in fact for making his statements to Kloe. Second, even if Sgt. Bell had a factual basis for his statements, Defendant, through Kloe and the Maroon, did not accurately report or 'republish' Sgt. Bell's statements.  Instead, they made sensationalized exaggerations of Sgt. Bell's statements. Simply because the statements regarding chemical weapons and social media posts were made by an officer – in the case of Sgt. Bell – or the "media," in the case of those working for The Maroon, the

matter at hand was not newsworthy. Defendant cannot be permitted to manufacture its own defense through its own publication. *Cianci v. New Times Pub. Co.* 639 F.2d 54, 61 (2nd Cir. 1980).

Further, while Defendant was allegedly commenting on a "criminal investigation" or the "arrest," there is no bright-line rule establishing that any and all allegations of criminal conduct are matters of public interest or public concern per se. Here, at its core, the speech is related to a one-sided "dispute" between two private individuals. Sahs was not a public official or someone within the public eye. He did not hold a position of power within the university.  In the cases discussed, the matters of criminal conduct involved felonies, public corruption, and conduct that could impact the community at large. Much like in *Yount,* where matters related to judicial proceedings might be "public" as a technicality, this does not render them of public interest. The allegations related to the absurd allegations of possessing chemical weapons were not the basis for any criminal charges – at the time they were published or otherwise – and not something that "concerned" the public until Defendant improperly thrust the matter into the public arena.

Moreover, none of the "facts" at issue were a matter of public record, nor part of an official public proceeding until March 3, 2023 – i.e. *after* a number of the defamatory statements at issue were "published," thus, to the extent that Defendant attempts to rely upon the matters being of "public" record, they cannot do so for the statements published by Sgt. Bell or by Kloe Witt in the first article.[12]

## IV.    <u>Plaintiff can Demonstrate a Likelihood of Success on Each of His Claims Under Both Louisiana and Florida Law.</u>

Should the Court determine that Defendant has satisfied its burden pursuant to Art. 971, Plaintiff's Complaint still should not be dismissed, as Plaintiff is able to demonstrate a likelihood of success for each claim, under both Louisiana and Florida law.[13] "In cases where more than one claim

---

[12] See footnotes 2 & 6, *supra*.

[13] Plaintiff states that the analysis under this section focuses on Louisiana law as that is the only law which can be applied to Art. 971.  Should the Court find that Florida law applies, the analysis under Art. 971 is moot.  However, the principles

is alleged in the petition and a special motion to strike is filed, the courts examine the probability of success of each claim individually; if a plaintiff can demonstrate a probability of success on any of her claims, then the special motion to strike must fail." *Frigon v. Universal Pictures, Inc.* 2017-0993 p. 17 (La. 6/21/18), 255 So.3d 591, 602. Here, Plaintiff is more than able to demonstrate a probability of success on each of his claims.

Defendant specifically argues that Plaintiff will not be able to demonstrate fault or malice in regard to Sgt. Bell's statements (the "Slanderous Statements"); falsity or fault with Ms. Witt's statements in the first Maroon article (the "First Libelous Statements"); or falsity or fault with Professor Giusti's statements in the second Maroon article (the "Second Libelous Statements")(herein collectively the "Libelous Statements"). Plaintiff will address each of these arguments in showing that Plaintiff can demonstrate a probability of success on each claim.

### A. Plaintiff Can Meet His Reciprocal Burden of Demonstrating a Likelihood of Success.

#### 1. Plaintiff will prevail on his claim for slander and defamation as well as slander per se and defamation per se

To succeed on a claim for defamation, "a plaintiff must necessarily prove four elements: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) a fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Fitzgerald v. Tucker*, 98–2313, p. 10 (La. 6/29/99), 737 So.2d 706, 715. "A statement is defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, deter others from associating or dealing with the person, or otherwise expose the person to contempt or ridicule." *Kennedy v. Sheriff of East Baton Rouge*, 2005–1418 p. 4 (La.7/10/06), 935 So.2d 669. These standards embrace claims sounding as either slander or libel. See *Hogan v. Williams*, 18-620 (La. App. 5 Cir. 5/23/19), 274 So. 3d 762, 768. (Slander and libel are claims which are broadly

---

espoused in the Louisiana case law are the same or similar to those in Florida, and Plaintiff's arguments are similarly applicable under Florida law, which should apply to this case.

encompassed within the tort of defamation.)  "Words which expressly or implicitly accuse another of criminal conduct, or which by their very nature tend to injure one's personal or professional reputation, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se." *Kosmitis v. Bailey*, 28,585, p.4 (La.App. 2 Cir. 12/20/96), 685 So.2d 1177, 1180; *Lemeshewsky*, 464 So.2d at 975.  When defamation per se is proven, malice is presumed.  *Kosmitis*, 28,585, at 4, 685 So.2d at 1180. "When words are not defamatory per se, a plaintiff must prove, in addition to defamatory meaning and publication, the elements of falsity, malice (or fault) and injury." *Id*.

Additionally, "publications concerning matters of public interest are protected by the first amendment absent proof of actual malice."  *Rosenbloom v. Metromedia,Inc*., 3 Cir. 1969, 415 F.2d 892.  Thus, if the statements are considered to be matters of public interest, a plaintiff must make a showing for malice in both his claims for defamation and defamation per se, which Plaintiff can.

### a.  Defendant made false and defamatory statements about Plaintiff to Third Parties

"The question of whether a communication is capable of a particular meaning and whether that meaning is defamatory is one for the court."  See *Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993). Courts ask three questions to determine if a statement is defamatory: (1) "whether the communication was reasonably capable of conveying the particular meaning or innuendo ascribed to it by the plaintiff,"   (2) "whether that meaning is defamatory in character,"  and, (3) "whether the meaning in question was in fact conveyed to and understood by the recipient of the communication." *Johnson v. Purpera*, 2020-01175 (La. 5/13/21), 320 So. 3d 374, 388 1); *Sassone*, 626 So.2d at 352.

Defendant's Slanderous Statements and Libelous Statements were reasonably capable of conveying the particular meaning ascribed by Plaintiff which was that he had deadly chemicals in his possession, that he was a terrorist, and that he was a stalker and disregarded other people's privacy interests because he published personal and highly sensitive information about another student on

22

social media.  This meaning is clearly defamatory in meaning as Plaintiff is inaccurately being called a criminal for heinous crimes such as terrorism.  Finally, it is clear that the meaning attributed by the Plaintiff was in fact conveyed to and understood by the recipients, the student reporter, the Assistant Director for Residential Community Standards, and readers of the Maroon, to have the same meaning that Plaintiff attributed to the Slanderous and Libelous Statements because Plaintiff was expelled.

These Slanderous and Libelous Statements, which were clearly made to third parties, are false and are highly defamatory given that Plaintiff is not in possession of chemicals and is not dangerous, a criminal, a terrorist, did not publish information about his accuser online.  Being attributed as a criminal, much less a terrorist, is highly stigmatizing.  Thus, Plaintiff can establish that the statements were false and defamatory.

### b.  Defendant's statements were unprivileged.

Privilege can be invoked as an affirmative defense to a defamation claim.  *Costello v. Hardy*, 03–1146, 15 (La.1/21/04), 864 So.2d 129, 141.  There are two categories of privileged communications – absolute and conditional or qualified.[14]  *Madison v. Bolton*, 234 La. 997, 102 So.2d 433, 439 n. 7 (1958).  "Under Louisiana law, communications made in a judicial or quasi-judicial proceeding carry an absolute privilege."  *Bienvenu v. Angelle*, 254 La. 182, 223 So.2d 140, 144 (1969).  Absolute privilege cannot be rebutted; however, conditional or qualified privilege can be shown to not apply.  A two-step process is used to determine whether a conditional or qualified privilege exists.  *Smith v. Our Lady of the Lake Hospital, Inc*., 93–2512, 18 (La.7/5/94), 639 So.2d 730, 745.  The first step of the analysis is to determine "whether the attending circumstances of a communication occasion a qualified privilege.  The second step of the analysis is to determine… whether the privilege was abused…" *Kennedy v. Sheriff of E. Baton Rouge*, 2005-1418 (La. 7/10/06), 935 So. 2d 669, 682; see *Smith*, 93–2512 at 18, 639 So.2d at 745.

---

[14] The term conditional or qualified can be used interchangeably.

"Louisiana courts have similarly recognized that the public has an interest in possible criminal activity being brought to the attention of the proper authorities and have extended a qualified privilege to remarks made in *good faith*." *Kennedy*, 2005-1418, 935 So. 2d at 683 (emphasis added); see *Simon v. Variety Wholesalers, Inc.*, 2000–0452 (La.App. 1 Cir. 5/11/01), 788 So.2d 544, writ denied, 01–2371 (La.11/16/01), 802 So.2d 617. Good faith is to be determined by the fact finder---the jury in the instant case. In *St. Amant v. Thompson* the U. S. Supreme Court held that "[t]he finder of fact must determine whether the publication was indeed made in good faith." *St. Amant v. Thompson* 390 U.S. 727, 732 (1968). As to whether a publisher abused the qualified privilege by acting with reckless disregard for the truth, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id*, n. 3 citing *Curtis Publishing Co*. v. *Butts*, 388 U.S. 130, 169-170 (1967). Thus, conditional privilege is not applicable if the statements are made by an individual, such as Sgt. Bell and Prof. Giusti, who knows the statements are false or acts in reckless disregard as to the truth or falsity of the statements. *Trentecosta v. Beck*, 96–2388, p. 7 (La.10/21/97), 703 So.2d 552, 562-63. "To establish a reckless disregard for the truth, the plaintiff must show that the false publication was made with a high degree of awareness of probable falsity, or that the defendant entertained serious doubt as to the truth of his publication." *Starr v. Boudreaux*, 978 So. 2d 384, 390 (La. Ct. App. 2008) citing *Tarpley v. Colfax Chronicle*, 94-2919, p. 2 (La. 2/17/95), 650 So.2d 738, 740.

> i. **The attending circumstances surrounding Defendant's Slanderous and Libelous Statements occasioned a conditional privilege.**

Defendant's statements were not made in a judicial or quasi-judicial proceeding. Thus, an absolute privilege does not apply. However, the attending circumstances of the communications occasioned a conditional privilege as the statements were about possible criminal activity which is an important issue to the public. Defendants, however, abused this conditional privilege because the statements were made with malice or lack of good faith.

ii.  **The qualified privilege does not apply because Defendant made the Slanderous and Libelous Statements with malice.**

Defendant argues that the statements made by Sgt. Bell are subject to a qualified privilege as Sgt. Bell made his statements in his role as a law enforcement officer and in connection with an arrest or investigation.  (Doc. 43-1 pg. 19.) However, as Defendant correctly notes, any potential qualified privilege, or immunity under La. R.S. 9:2798.1, is overcome by a showing of actual malice in making the statements at issue. *See Trentecosta*, 703 So.2d at 564, *see also* La R.S. 9:2798.1(C)(2).

Defendant asserts that it is immune from liability pursuant to La. R.S. 9:2798.1 (herein "Discretionary Acts Exception"). However, discretionary acts are not automatically immune from liability. "An exception to the immunity applies when the acts or omissions constitute 'criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.'" *Ballex v. Municipal Police Employees' Retirement System*, 2016-0905 (La.App. 1 Cir. 4/18/17), 218 So.3d 1076, 1084, writ denied, 2017-00822 (La. 9/22/17), 228 So.3d 743; LSA-R.S. 9:2798.1(B) & (C)(2). This exception "connotes conduct more severe than negligent behavior.  Recklessness is, in effect, 'gross negligence.'" *Mariana v. Magnolia Auto Transp., LLC*, 21-447 (La. App. 5 Cir. 5/26/22), 341 So. 3d 1281, 1291. As discussed further below, Plaintiff can demonstrate actual malice for the statements made by Sgt. Bell sufficiently overcome any qualified privilege or immunity.

c.  **Defendant's statements were made with malice.**

In order to overcome any qualified privilege or immunity available to Defendant for Sgt. Bell's statements, and should the Court find that the matter reported in the two Maroon articles concerned a public issue, Plaintiff is required to make a prime facie showing that Defendant acted with  actual malice by publishing the statements at issue.  To make a showing of malice, a plaintiff must demonstrate that the publisher of the statement "had knowledge of the statement's falsity or made the statement with reckless disregard of whether it was false or not." *Trentecosta*, 96-2388, 703 So. 2d at 560.  To prove reckless disregard, a plaintiff must show with clear and convincing

proof that the statement was published with reckless disregard for whether the statements were false or not. *Id*.

"Reckless disregard' cannot be fully encompassed in one infallible definition." *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). In *Curtis Publishing Co. v. Butts*, the court stated that recklessness "requires a plaintiff 'prove that the publication involved was deliberately falsified or published recklessly despite the publisher's awareness of probable falsity.'" 388 U.S. 130, 153, 87 S. Ct. 1975, 1991, 18 L. Ed. 2d 1094 (1967). In *St. Amant* the court stated that to show recklessness, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." 390 U.S. at 731.

The Court in *St. Amant* understood, however, that base allegations of 'good faith', as put forth by Defendant here, and stated:

> The defendant in a defamation action brought by a public official cannot, however, automatically ensure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." *Id*. at 732.

The Louisiana Supreme Court, in *Trentacosta,* took this rationale from *St. Amant* and found that statements made by a police officer regarding an investigation that go beyond the facts uncovered in that investigation, demonstrate a reckless disregard for the truth, stating "Smith went beyond the facts uncovered by the investigation. In his verbal statements to the press, he embroidered onto the underlying facts a sensational statement about *Trentecosta* that, on this record, was not based on information furnished to Smith by investigators, by an informant, or by anyone else, but was apparently created by Smith." *Trentecosta,* 703 So.2d at 562. Further, the court found that, while the officer testified that he believed the statements to be true, the officer used information about the investigation and "added his own suspicions to form a sensational connection with the target of the investigation." *Id.*

26

Sgt. Bell's statements in this matter are analogous to the officer in *Trentecosta*. Sgt. Bell's own testimony in his affidavit demonstrates the sensationalized statements that he 'embroidered onto the underlying facts' similar to *Trentecosta*. Sgt. Bell states in his affidavit that he was briefed by the NOPD and informed that there was "an arrest warrant for Luke Sahs, that a criminal complaint had been made at the NOPD stating that Luke Sahs had been stalking another Loyola student and had made threatening statements that he had the ability to mix dangerous chemicals that could be used to harm other people on Loyola's campus." (See Doc. 43-3, Ex. 1 at ¶ 9.)

Next, Sgt. Bell testifies as to the conversation that he had with Kloe Witt, who Sgt. Bell acknowledges was a student reporter for Defendant. Sgt. Bell admits that he told Kloe Witt "[t]here was the separation order against this guy [Plaintiff] for stalking, but in addition to that, he started to go on social media and talk about things like where his parents are from, his nationality; he has chemical material in possession that he can mix, that he can kill people with and different things like that, so I think he's gonna be brought up on some terroristic threats also" (*Id.* at ¶13.) In this paragraph, Sgt. Bell claims that this was information he learned from the NOPD and later claims that he believed the statements were true when he made them. (*Id.*)

Absent from Sgt. Bell's testimony, however, is any discussion about how he 'learned' this information from the NOPD. Sgt. Bell is unable to state that NOPD told him the information that he relayed to Kloe Witt. Sgt. Bell is further unable to point to any document which indicates that NOPD ever received a report that Plaintiff **was in possession** of chemicals, or that there had been any allegations against Plaintiff for using social media in any inappropriate manner. Finally, Sgt. Bell is unable to confirm that he was told by any specific NOPD officer that Plaintiff would face any charges even closely tangential to charges of terrorism or terroristic threats.

In fact, Sgt. Bell is unable to testify to these facts because no NOPD officer believed or stated these facts. As demonstrated in the body cam footage of the NOPD officers involved in the arrest,

they did not believe that Plaintiff was in possession of any chemicals or that Plaintiff would be charged with any terror related crimes. (E. Carp. Dec. at ¶26.) Further, Sgt. Bell was present, and knew that NOPD officers entered Plaintiff's room and did a cursory search of the room and did not find any dangerous or suspicious chemicals. (*Id. at* ¶18, 21-22 & Ex. 4, 5, 6 thereto.) Finally, Sgt. Bell was present when Plaintiff was arrested and knew that no chemicals were found on his person during the arrest.

Even reviewing the narrative in the incident report created by NOPD Officer Coleman will find no mention of the NOPD stating concerns that Plaintiff **was in possession** of chemicals, only unfounded allegations that Plaintiff knew how to mix chemicals. Further, there is no mention of any postings to social media by Plaintiff similar to those mentioned by Sgt. Bell. (FAC ¶ 30& Ex. IX.)

Here, Sgt. Bell is simply stating that he was acting in good faith or that he believed those statements to be true as a simple platitude to try and satisfy the seemingly easy standard set forth to overcome actual malice. As is pointed out in *St. Amant*, this Court is not required to accept such self-serving statements in light of evidence showing the contrary. Sgt. Bell sensationalized the story beyond the facts that had been developed, similar to the officer in *Trentecosta*, and as such, was acting with reckless disregard for the truth to constitute actual malice.

In addition, actual malice can be demonstrated in regard to the statements published in the two Maroon articles. Turning to the first article, Plaintiff can demonstrate the reckless disregard for the truth on two issues: 1) Kloe Witt was in possession of the Arrest Warrant for a period of time, which did not support Sgt. Bell's statements; and 2) neither the Arrest Warrant nor Sgt. Bell stated that Plaintiff made statements **about his accuser** on social media.

First, as alleged by Plaintiff and not refuted by Defendant in any supporting affidavit, Ms. Witt was in possession of the Arrest Warrant as she had requested, and been provided, the same by Sgt. Bell. (FAC ¶ 67.) While Ms. Witt might not have retained possession of the document, she

certainly had sufficient time to review the document and to discover that the Arrest Warrant did not contain any allegation that Plaintiff had chemicals in his possession or that Plaintiff had made any statements about his accuser on social media.  (See FAC, Ex. IV.)  Relying on the statements of Sgt. Bell, and not those contained in the official Arrest Warrant demonstrates Ms. Witt's desire to continue the effort to sensationalize the facts of this matter.

Second, the evidence has shown that there was no support for Ms. Witt's allegations in the First Maroon Article that Plaintiff "made social media posts about the student who completed the report, spreading personal information about them such as the individual's nationality and family." Sgt. Bell testified that he informed Ms. Witt that Plaintiff "started to go on social media and talk about things like where **his** parents are from, **his** nationality…"  (Doc. 43-3, Ex. 1 ¶13.)  Further, the Arrest Warrant, which was provided to Ms. Witt, contains allegations from Plaintiff's accuser that Plaintiff discussed **his** own heritage and personal background.  (FAC, Ex. IV.)  Nowhere in Sgt. Bell's statements or in the Arrest Warrant provided to Ms. Witt were there any allegations that Plaintiff had posted on social media about his accuser, or much less "spread personal information" about her or discussed her "nationality."  This statement is yet another example of fabrication by Defendant, and a complete demonstration of reckless disregard for the truth of the accusation.

Finally, reckless disregard for the truth can be shown further in Defendant's publication of the Second Maroon Article.  The Second Maroon Article repeats the false and defamatory statement regarding possession of chemical weapons, stating "The [Arrest Warrant] claimed Sahs was in possession of chemical materials that can be used to kill people."  The publication of the Second Maroon Article again demonstrates Defendant's reckless disregard for the truth.[15]

---

[15] Prof. Giusti's publication of the Second Libel Article ("The affidavit claimed Sahs was in possession of chemical materials that can be used to kill people.") in the Maroon exacerbated the defamatory statement "Sahs was in possession of chemical materials that can be used to kill people" in the First Libel Article, because **a sworn affidavit, which is signed by a Magistrate Judge, is probable cause for an arrest**.  In other words, Loyola was now, and is still today, promulgating to the public that there was **probable cause to arrest Sahs** for being in possession of chemical materials that can be used to kill people.

Defendant presents the testimony of Giusti to attempt to justify the publication of the Second Maroon Article and the false statement therein. In his testimony, Giusti states that he reviewed the narrative of NOPD Officer Coleman contained within the Arrest Warrant. Giusti then states that the only error made in the Second Maroon Article was his mischaracterization of the document as an affidavit instead of a report. However, a review of the Arrest Warrant again shows that there are no allegations that Plaintiff possessed chemicals that could be used to kill people. (FAC, Ex. IV.)

Officer Coleman's narrative, in the Incident Report, simply repeats the allegations submitted to the NOPD by Plaintiff's accuser. In the narrative portion of the Incident Report, the only reference to chemicals are the allegations that Plaintiff stated he knew how to mix chemicals. Not only did Officer Coleman not state that Plaintiff was in possession of chemicals, but Plaintiff's **accuser** further did not state that Plaintiff possessed chemicals. Despite this fact, Defendant found it necessary to continue to publish that Plaintiff was **in possession** of chemicals. Further, by stating that this information was somehow included in the Arrest Warrant, Defendant is trying to impress upon the reader that their statement was based on fact when it clearly was not. The statement is clearly false and Defendant knew it was false as Defendant had access to the Arrest Warrant and knew that those accusations were not contained within the report.

Plaintiff is more than able to make a prima facie case for actual malice against Defendant. First, Sgt. Bell made sensationalized statements regarding Plaintiff which had no basis in the facts of the investigation. Further, Ms. Witt took the statements she received from Sgt. Bell and continued to sensationalize those statements. Finally, Defendant published the Second Maroon Article and stated that it had reviewed the Arrest Warrant which suggested that Plaintiff had possessed dangerous chemicals, despite no such accusation being made. Thus, Plaintiff has established actual malice against Defendant.

### d. Plaintiff suffered injury as a result of Defendant's statements

The injury resulting from the defamatory statements "may include nonpecuniary or general

damages such as injury to reputation, personal humiliation, embarrassment and mental anguish even when no special damage such as loss of income is claimed." *Costello v. Hardy*, 2003-1146 (La. 1/21/04), 864 So. 2d 129, 141; see *Kosmitis*, 28, 585 at 4, 685 So.2d at 1180. Regardless of the kind of injury, a plaintiff must present evidence of the injury suffered and that the defamatory statements were "a substantial factor in causing the harm." *Costello,* 2003-1146, 864 So. 2d at 141; see *Kosmitis*, 28, 585 at 5, 685 So.2d at 1181.

Plaintiff suffered extreme mental anguish from Defendant's Slanderous Statements and Libelous Statements. The Slanderous and Libelous Statements caused Plaintiff embarrassment and humiliation, loss of reputation, and ostracization from his social circles. Thus, Plaintiff can make a showing for damages. (See Sahs Dec. at ¶¶18-23.) Therefore, Plaintiff has established that he is likely to prevail on his claim for slander and defamation as well as slander per se and defamation per se because the published Slanderous Statements and Libelous Statements were false and defamatory, were made reckless disregard as to their truth or falsity, and damages can be shown. Additionally, because the Defendant acted in bad faith, a conditional or qualified privilege does not apply.

### 2. Plaintiff will prevail on his claim for defamation by implication

Plaintiff pled an alternate claim for defamation by implication in the Amended Complaint in the event that the Court found the Slanderous Statements and the Libelous Statements to be true. If the Slanderous Statements and the Libelous Statements are found to be true, Plaintiff can prevail on a claim for defamation by implication. "[D]efamation by implication or innuendo, [and] 'occurs when one publishes truthful statements of fact, and those truthful facts carry a false, defamatory implication.'" *Johnson v. Purpera*, 2020-01175 (La. 5/13/21), 320 So. 3d 374, 389; quoting *Fitzgerald v. Tucker*, 98-2313, p. 12 (La. 6/29/99), 737 So.2d 706, 737. Defamation by implication is an available claim if the statements are about a private individual and a private affair. See *Schaefer v. Lynch*, 406 So.2d 185, 188 (La. 1981). In defamation by implication actions between a private

31

individual and a media defendant, the plaintiff must prove "that the alleged implication is the principal inference a reasonable reader or viewer will draw from the publication as having been intended by the publisher." *Sassone v. Elder*, 626 So. 2d 345, 354 (La. 1993).

### a. Plaintiff is a private individual and Defendant's statements were about a private affair.

Plaintiff is a private individual. Defendant's statements that Plaintiff was in possession of chemicals that could be used to kill people and that it was believed that Plaintiff would be brought up on terrorist charges were not matters of public concern. Public concern is speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). Defendant cannot publicize additional defamatory statements, which were not a part of the arrest, and escape liability for the defamatory statements based on the notion that the defamatory statements constitute protected speech because they are a matter of public concern. Plaintiff was arrested for misdemeanor stalking and statements that go beyond the charges outlined in the arrest warrant are therefore not matters of public concern because they were not a part of the arrest. Plaintiff was not arrested for charges related to possession of deadly chemical materials or terrorism. However, Defendant recklessly published these statements which implied they were charges related to the arrest.

### b. Plaintiff's alleged implication is the principal inference a reasonable person would draw from Defendant's statements.

Defendant's statements that Plaintiff was in possession of chemicals that could be used to kill people and that it was believed that Plaintiff would be brought up on terrorist charges implied that Plaintiff was a danger to the community and should be avoided. A reasonable person would also draw the same implication as a person linked to criminal activity and terrorism is inherently perceived as a danger. This implication is false and defamatory because Plaintiff is not dangerous.

Defendant's statements were about a private individual and a private affair. Further the

statements falsely insinuated that Plaintiff is a danger to the community.  Therefore, Plaintiff can succeed on a claim for defamation by implication in the event that the Court finds the Slanderous Statements and Libelous Statements were true.

## 2. <u>Plaintiff will prevail on his claims for Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing</u>

In its Motion, Defendant simply glosses over the allegations in Plaintiff's Complaint relating to Breach of Contract and Breach of Covenant and makes conclusory allegations that Plaintiff's claims should be subject to the same analysis as his claims of defamation.  However, in reviewing Plaintiff's complaint, this argument must fail.

Plaintiff's allegations of Breach of Contract and Breach of the Duty of Good Faith do not, in any way, implicate a right of petition or free speech. Instead, these claims challenge the arbitrary nature for which Defendant meted out punishment against Plaintiff.  In its Motion, Defendant only states that "Sgt. Bell's oral statements to Witt, and the two *Maroon* articles at issue which the speakers reasonably believed to be true, constitute free speech and protected speech on a matter of public concern – the criminal investigation, suspected criminal activity, and arrest of Luke Sahs. Accordingly, Art. 971 applies to Loyola's protected speech at issue in this case."  (Doc. 43, p. 16.) Nowhere is there mention of the breach of the Student Code of Conduct or the discipline handed out to Plaintiff, which form the basis for Plaintiff's claims of Breach of Contract and Breach of Covenant, as "protected speech".

Because the actions described in Plaintiff's Complaint and causes of action for Breach of Contract and Breach of the Duty of Good Faith, do not constitute "protected speech" they cannot be included for consideration in an Art. 971 Motion to Strike.  As these claims cannot be considered pursuant to Art. 971, Plaintiff need not engage in analysis regarding his prima facie showing.

Plaintiff further states that this same analysis applies to Sahs' claims for negligence (*Id.* at ¶¶191-200) and Sahs' claim for negligent infliction of emotional distress (*Id.* at ¶¶ 201-205).  La.

C.C.P. art. 971 does not apply to either of these claims, since both causes of action assert claims that are not restricted to the subject of a "person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue". See Art. 971.

### 3. <u>Plaintiff will prevail on his claim for Negligence</u>

To prevail on his claim for negligence, Plaintiff must prove:

> "(1) the defendant had a duty to conform his or her conduct to a specific standard of care (the duty element); (2) the defendant failed to conform his or her conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element)." *Mathieu v. Imperial Toy Corp.,* 94-952, pp. 4-5 (La. 11/30/94), 646 So.2d 318, 322.

Defendant fails to provide any argument that Plaintiff cannot make his claim for negligence beyond stating that the negligence claim is a regurgitation and resuscitation of Plaintiff's claims in defamation. A review of Plaintiff's Complaint shows, however, that this assertion is baseless and Plaintiff has stated a prima facie case for negligence.

While Plaintiff does allege that Defendant was negligent in the publication of false and defamatory statements about Plaintiff, without verifying the truth or falsity of such statements, Plaintiff also alleges that Defendant was negligent for suspending Plaintiff based on unfounded, false reasons and pretenses; in its duties to properly supervise, train and/or instruct its private security employees; and in its mishandling of confidential or otherwise private information that was shared with its own media entity. Defendant fails to explain how these claims, which also make up Plaintiff's negligence claim, are 'regurgitations' of Plaintiff's defamation claims.

Plaintiff can satisfy all the elements of his negligence claim. It is undisputed that Defendant owed a duty to Plaintiff to exercise reasonable care including conforming to a certain standard of conduct. (FAC at ¶193.) Plaintiff has also provided significant evidence to show that Defendant, by and through its employees, did not conform with it's duty of care owed to Plaintiff, including suspending Plaintiff without an opportunity to defend himself, failing to train, instruct or supervise

its private security employees, and providing otherwise confidential information to members of the media for publication. (*Id.* at 195.) Finally, Plaintiff has demonstrated that the negligence of Defendant was the legal cause and cause in fact of his injuries in this matter. (*Id.* at ¶¶23 and 200.)

### 4. Plaintiff is Likely to Prevail on his Claim for Negligent Infliction of Emotional Distress

Defendant states that Plaintiff's claim for negligent infliction of emotional distress ("NIED") must also fail because it is derivative of Plaintiff's defamation case. Contrary to Defendant's assertions, Louisiana law allows for independent claims of NIED. The Louisiana Supreme Court set forth in *Spencer v. Valero Ref. Meraux, LLC*, 356 So. 3d 936 (La. 2023), the standard for NIED, which includes proving the elements of negligence, and then a showing of "serious" mental disturbance or damage. *Id.* at 950.

Further, the Court in *Spencer* elaborated on what is not required to prove a claim for NIED, including that Plaintiff need to show the existence of a special, direct duty owed to Plaintiff or that Defendant's conduct was outrageous or that Plaintiff's emotional distress be reasonably foreseeable or severe and debilitating. "A claim for negligent infliction or emotional distress is a claim that, by definition, requires a plaintiff to provide negligence." *Id.* Here, Plaintiff has satisfied his burden to prove his claim for NIED. As discussed above, Plaintiff has proven his claim for negligence against Defendant. Further, Plaintiff has submitted both his declaration, offering evidence that he has suffered severe and significant mental anguish caused by Defendant's conduct. (Sahs Dec. ¶¶18-22.)

## XI.   CONCLUSION

Defendant, through its Motion, has failed to show that Plaintiff's case should be stricken or dismissed at this early stage. Plaintiff has demonstrated that Defendant acted with actual malice in its actions and Defendant's conduct is not of the nature that was intended to be protected pursuant to Art. 971, and as such, Defendant's Motion should be DENIED. Pursuant to subsection (B) of Art. 971, Plaintiff is entitled to attorney fees and costs for being forced to defend against this motion.

Dated: **November 20, 2024.**              Respectfully submitted,

By: /s/  Andrew C. Stebbins
Andrew C. Stebbins
(Ohio Bar No. 0086387) (*pro hac vice*)
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Telephone Office: (216) 736-4233
Email: astebbins@bdblaw.com

John W. Carpenter
(La. Bar No. 03940)
Law Offices of John W. Carpenter, LLC
201 St Charles Ave., Suite 2500
New Orleans, La. 70170
Telephone Office: (504) 599-5955
Telephone Cell: (415) 577-0698
Email: john@jwcarpenterlaw.com

Elizabeth Bagert Carpenter, Esq.
(La. Bar No. 31653)
Law Office of Elizabeth Bagert Carpenter
201 St Charles Ave., Suite 2500
New Orleans, La. 70170
Telephone Office: (504) 599-5955
Telephone Cell: (504) 373-4624
Email: ebc@neworleans-criminal-defense.com

Christina N. Williams
(Ohio Bar No. 0093726) (*pro hac vice*)
Buckingham Doolittle & Burroughs LLC
1375 E. 9th Street, Suite 1700
Cleveland, OH 44114
Telephone Office: (216) 736-4234
Email: cwilliams@bdblaw.com

*Attorneys for Plaintiff*
Luke G. Sahs

4854-2086-6044, v. 6